# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **CHAD BRENNER, Administrator of** | : | |
| **the Estate of Chamaria Drake, Deceased** | : | **Case No. 1:04cv727** |
| | : | |
| **Plaintiff,** | : | **JUDGE O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | **OPINION & ORDER** |
| **CUYAHOGA COUNTY** | : | |
| **DEPARTMENT OF CHILDREN AND** | : | |
| **FAMILY SERVICES, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

This is a tragic case in which the reunification of a young mother with her seventeen-month old infant daughter, both living with foster families, resulted in the death of the infant. Although hindsight reveals - and the proper foresight probably could have revealed - that the reunification was, at best, ill-advised, it nonetheless does not amount to a violation of rights guaranteed by the Constitution of the United States of America, as Plaintiff has alleged. The Court, therefore, **GRANTS in part** the pending Motion for Summary Judgment (Doc. 83) filed by the County Defendants,[1] granting judgment in favor of the County Defendants as to Plaintiff's only federal claim - a claim under 42 U.S.C. § 1983. The Court also **REMANDS** the remaining state law claims to the Cuyahoga County Court of Common Pleas, where this case originally was filed.

---

[1] As discussed below, "County Defendants" refers to the Cuyahoga County Board of Commissioners and County employee Elizabeth McGovern. They are the only moving defendants in connection with the Motion for Summary Judgment currently before the Court.

I.      BACKGROUND

On March 24, 2004, Plaintiff filed this lawsuit in the Cuyahoga County Court of Common

Pleas, and it was removed to this Court on April 19, 2004 pursuant to 28 U.S.C. § 1441.  Plaintiff's

Third Amended Complaint (hereinafter referred to as "the Complaint") (Doc. 27) names as

defendants six parties and four "John Does," as follows:  the Cuyahoga County Department of

Children and Family Services ("CCDCF"); Barbara Branch ("Branch"), a social worker at CCDCF;

Elizabeth McGovern (now known as Elizabeth Grizer but referred to herein as "McGovern"),

another social worker at CCDCF; the Board of Commissioners of Cuyahoga County, Ohio

("Cuyahoga County"); Bellefaire Jewish Children's Bureau ("Bellefaire"); Sharnese Brock

("Brock"), the mother of the deceased child; and John Does I-IV.  Bellefaire, Branch, and CCDCF

have been dismissed without prejudice (Docs. 68, 84), and Plaintiff has not substituted any parties

for John Does I-IV.  The only remaining defendants, therefore, are Cuyahoga County, McGovern,

and Brock.[2]

As to these remaining defendants, Plaintiff maintains one federal claim and three state law

claims against the County Defendants.  The federal claim is a claim under 42 U.S.C. § 1983

(hereinafter "§ 1983") for violation of Chamaria Drake's right to due process under the Fourteenth

_____

[2]  Only Cuyahoga County and McGovern (hereinafter "the County Defendants") have
moved for summary judgment.  Those defendants, therefore, will be referred to as "Defendants"
for purposes of this Opinion & Order.

Amendment.[3]  The state law claims are a claim for wrongful death, a claim for conscious pain and suffering, and a claim for failure to report and investigate child abuse under O.R.C. §§ 2151.42(A)(1) and 2151.421(F)(1).  In addition, Plaintiff asserts a state law claim against Brock, alleging that Brock "negligently, intentionally, and maliciously assaulted and battered Chamaria Drake."  (Doc. 27 at ¶ 36.)  The County Defendants have also filed a cross-claim against Defendant Brock, alleging that, if they should be found liable, they are entitled to contribution and/or indemnity from Brock.

The events giving rise to this lawsuit are detailed below, and they are not in dispute except where noted.  On July 17, 2001, Chamaria Drake was born.  Chamaria's biological father was Marcus Drake and her biological mother was Sharnese Brock, who is currently twenty-years old but was a minor during the time period relevant to this lawsuit.  At the time of Chamaria's birth, Brock was in the temporary custody of CCDCF and living at Euclid House, a group home for troubled teens.  Brock initially had been removed from the custody of her mother, Patreace Brock, and placed in the group home because, at the time of her removal, Brock's twin sister was close to having her own baby, and Brock previously had been accused of sexually assaulting her six-year old female cousin.  In addition, Brock had behavior problems and was involved in fights at school.  Brock was living at Euclid House when Chamaria was born.  Two days after her birth, Chamaria was also taken into the temporary custody of CCDCF and placed in the home of foster care providers Albert and Belinda Williams.

_____

[3]  The Complaint cites Chamaria's rights to due process under both the Fourth and Fourteenth Amendment.  Because the Fourth Amendment does not contain any reference to due process, and because the Complaint cannot be read to assert any rights secured by the Fourth Amendment, the Court reads Plaintiff's § 1983 claim as arising from a deprivation only of Chamaria's Fourteenth Amendment right to due process.  Plaintiff's claim is one invoking the substantive rather than procedural component of the Due Process Clause.

In November 2001, Brock was transferred from Euclid House to Bellefaire.  At Bellefaire, Brock was treated by a psychotherapist-supervisor, Dr. Robert Polish, and was assigned a case worker, Travena Golliday.  In November 2002, Brock was "stepped down" from Bellefaire and placed in the home of Traunita Williams, a foster care provider.  Chamaria was in foster care in a different home than Brock.  Brock continued to receive treatment from her Bellefaire treatment team while living with Ms. Williams.  Between July 2002 and January 23, 2003, Brock had seven supervised visits with Chamaria.

On January 7, 2003, Defendant McGovern, a social worker at CCDCF who was assigned to Brock's case, held a semi-annual review ("SAR") during which she discussed the possibility of reuniting Brock with her daughter Chamaria, then seventeen-months old.  At the SAR were Patreace Brock, Sharnese Brock's biological mother; Albert and Belinda Williams, Chamaria's foster parents; Travena Golliday, Brock's Bellefaire social worker; and Sheila Reynolds,Golliday's supervisor at Bellefaire.  Defendants contend that, although everyone at the meeting agreed that Brock and Chamaria should be reunited at some point, only McGovern decided that it should be done on an expedited basis.

On January 23, 2003, the Cuyahoga County Juvenile Court conducted a reunification hearing. McGovern, the only witness who testified at the hearing, recommended that Brock and Chamaria be reunified.  That same day, the Cuyahoga County Juvenile Court issued the following order:

> IT IS THEREFORE ORDERED THAT the Order heretofore made in this matter for temporary custody is terminated.  The child is committed to the legal custody of Sharnese Brock, mother . . .

(Doc. 91, Ex. H.)  Thereafter, Chamaria was removed from the foster care of Albert and Belinda Williams and placed with Brock, who was still living in the foster care of Traunita Williams.

4

Defendants present evidence that those involved with Brock's case, at best, were surprised by the early reunification and thought that Brock was not ready to care for an infant and, at worst, were afraid that Brock might injure Chamaria.  For example, Dr. Polish was "extremely surprised" that reunification occurred when it did and felt that Brock was "definitely not" ready to be reunified at that time.  (Polish Dep. 43:20 - 44:16.)  In addition, Brock's aunt, Margie Mack, states in her affidavit that, prior to reunification, she called McGovern and told her that Sharnese wanted to give up Chamaria, was afraid of hurting her, did not know how to take care of an infant or toddler, and, if reunited, might physically harm Chamaria.  (Mack Aff. at ¶ 17.)  Chamaria's foster parents also state that they expressed similar concerns to McGovern prior to reunification.  (Albert Williams Aff. at ¶¶ 15, 17; Belinda Willaims Aff. at ¶¶ 15, 17.)  Brock herself testified at her deposition that, although she told the juvenile court judge at the reunification hearing that she wanted custody of her daughter, she felt pressured by her mom and McGovern to do so.  (Brock Dep. 56:11-13.)  In addition, Brock said that she told McGovern prior to the reunification that she did not want her daughter and was not ready to be a mother.  (Brock Dep. 52:19 -53:9.)

On February 7, 2003, after Chamaria was placed into Brock's legal custody, Chamaria was treated at the hospital for a head injury, allegedly caused by one of her barrettes.  During February 2003,  McGovern's case notes reflect that Brock's foster mother mentioned, on two occasions, that she thought Brock was being too rough with Chamaria.  On February 24, 2003, however, at another SAR with many of the same people present, including McGovern, Traunita Williams, and Dr. Polish, no one expressed a concern that Brock was likely to injure, harm, or kill Chamaria.  After that meeting, Chamaria remained in Brock's custody.

On March 13, 2003, Chamaria died from a blunt impact to the head, apparently as a result

5

of Brock striking Chamaria on the head with a hairbrush.  In July 2003, Brock was convicted of involuntary manslaughter and currently is incarcerated in the Scioto County Juvenile Correction Center.

The administrator of Chamaria's estate maintains this lawsuit against the remaining defendants: Cuyahoga County, McGovern, and Brock.  The County Defendants filed the present Motion for Summary Judgment on January 13, 2006, seeking judgment on all four claims asserted against them by Plaintiff.  The Court now turns to that motion.

## II.    DISCUSSION

### A.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

6

Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

   **B.    Analysis**

   As the facts reveal, there is no doubt this is a tragic case. The terrible circumstances surrounding Chamaria's death, however, do not alter the provisions of the Constitution or the legal precedent by which this Court is bound. The only question before this Court, at least as to Plaintiff's federal claim, is whether the tragedy that occurred here amounts to a constitutional violation. In cases where, as here, a claimant attempts to hold government officials responsible for injuries caused by private individuals, the Sixth Circuit has noted that the leading Supreme Court case, *Deshaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), and its progeny, rarely permit the constitutional claim to go forward. *Jones v. Reynolds*, 438 F.3d 685, 688 (6th Cir. 2005). This case is no exception, and, although the facts of this case perhaps present a closer decision than most, this Court must conclude that Plaintiff's § 1983 claim fails as a matter of law.

   Defendants, not surprisingly, rely primarily on *DeShaney* in support of their argument that they cannot be held liable for Chamaria's death under § 1983. In response, Plaintiff attempts to distinguish *DeShaney* and also argues that two exceptions exist - one enunciated in *DeShaney* and

7

the other in its progeny - which form the basis of Defendants' liability in this matter.

### 1.    *DeShaney*

In *DeShaney*, a case with equally disturbing facts, the Supreme Court held that the Winnebago County Department of Social Services could not be held liable for injuries inflicted on a young child by his father, despite the fact that the Department had evidence of child abuse before it took temporary custody of the child and even more evidence of abuse after it returned the child back to his father. *DeShaney*, 489 U.S. at 192.  The four-year-old child was placed in temporary custody after he was treated at a hospital for injuries which the treating physician suspected were the result of child abuse. *Id.*   After a "Child Protection Team" decided that there was insufficient evidence to retain the child, he was returned to his father's custody. *Id.* Following the return of the child to his father, the Department later was notified when the child went to the emergency room twice with "suspicious injuries," and a case worker assigned to the case noticed suspicious injuries and other signs of physical abuse when she visited the home. *Id.* at 192-93.  Despite these warning signs, the Department took no action. *Id.* at 193.  Within four months of the child's last emergency room visits, the father beat the child so severely that the child suffered brain damage to the point that he was expected to spend the rest of his life in an institution for the profoundly retarded.  *Id.*

In finding that the Department was not liable under § 1983 for deprivation of the child's Fourteenth Amendment right to due process, the Court started with the principle that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure, life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at196.  Based on that fundamental principle, the Court stated that, "[a]s a general matter, then, we conclude that a State's failure to protect an individual against private

violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.  The Court went on to hold that the State in that case had no constitutional duty to protect the child because, although it was aware of the potential dangers to the child and even took custody of him at one point, the State "placed him in no worse position than that in which he would have been placed had it not acted at all." *Id.* at 201.

Defendants in the present case argue that *DeShaney* is controlling and prevents Plaintiff from establishing a violation of the Due Process Clause, thereby warranting dismissal of Plaintiff's § 1983 claim.  Like the defendants in *DeShaney*, the violence in this case was committed by a private individual, Brock, who had legal custody of the victim.  In addition, like the defendants in *DeShaney*, Defendants in this case, although they had temporary custody of Chamaria at one point, placed her in no worse position that she would have been in had they not acted at all - i.e., had they simply left Chamaria with Brock in the first instance.[4]  The Court agrees with Defendants, and finds that, absent a compelling ground on which to distinguish *DeShaney*, and absent an exception to the general principle enunciated in *DeShaney*, Defendants cannot be held liable for a constitutional violation.  The next step, therefore, is to evaluate Plaintiff's attempts to remove the present case from under the seemingly controlling holding of *DeShaney*.

Plaintiff first attempts to distinguish the facts of *DeShaney*.  Plaintiff argues that the Supreme Court's decision placed more emphasis on the State's <u>failure</u> to act rather than its <u>affirmative</u> act of transferring custody of the boy to his father; whereas, in the present case, Plaintiff's claim focuses

---

[4]  Although both cases involved "temporary" custody, the boy in *DeShaney* was only in custody for three days, whereas, in this case, Chamaria was with her foster parents for seventeen months before she was returned to Brock.  While that is a significantly greater length of custody, that distinction does not sufficiently distinguish these cases, as will be discussed below.

9

on Defendants' <u>affirmative</u> act of transferring custody of Chamaria to Brock, a transfer they assert was unnecessary and, from the perspective of most involved in the process, unwanted. This argument is unpersuasive, however, because, although *DeShaney* did involve the State's failure to act while the child was in his father's custody, it also involved the State's temporary custody of the child and affirmative return of the child to his father's custody. Indeed, the Court even addressed this point, finding that the fact "[t]hat the State once took custody of [the child] does not alter the analysis." *Id.* at 201. *DeShaney*, therefore, cannot be distinguished on that ground.

In addition, Plaintiff argues that there are two exceptions to the holding in *DeShaney* that can serve as a basis for imposing liability on Defendants in this case. The first is the so-called "state-created danger" doctrine, which courts, including the Sixth Circuit, have deemed to be a valid exception to the general principles of *DeShaney*. The second is the "special relationship" exception, which the Supreme Court expressly referred to in its opinion. The parameters of those exceptions and their applicability to the present case are explored below.

### 2.     State-Created Danger Doctrine

In *DeShaney*, the Supreme Court stated that, "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, <u>it played no part in their creation, nor did it do anything to render him any more vulnerable to them.</u>" *Id.* at 201. (emphasis added). Based on that language, the Sixth Circuit and other Circuits have recognized a "state-created danger" doctrine, which is an exception to the general principle that the state has no affirmative duty to protect individuals from private acts of violence. *See Jones*, 438 F.3d at 690. To establish a state-created danger claim, a claimant must show: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a

10

special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." *Id.* (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)).

Under the state-created danger theory, liability for violation of an individual's Fourteenth Amendment right to due process may be predicated on the State's failure to act after the State itself created or increased the risk of harm. In other words, "[i]f a state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982)).

In this case, Plaintiff contends that Defendants' affirmative act - transferring custody of Chamaria to Brock - created or increased the risk that Chamaria would be harmed by Brock.[5] Plaintiff argues that Defendants created or increased the risk of harm when they delivered Chamaria from her foster parents to Brock, whom they were told by different sources may pose a danger to Chamaria. In support of this assertion, Plaintiff cites two cases from district courts in Pennsylvania and one case from the New Mexico district court, in which those courts have found that a plaintiff advanced a viable theory of liability under § 1983 under facts similar to the ones presented in the

---

[5] Plaintiff's argument assumes that the act of reuniting Brock and Chamaria was an act by Cuyahoga County or McGovern even though it was the Cuyahoga County Juvenile Court that issued the order transferring custody. This assumption is premised on Plaintiff's unsupported statement that the Cuyahoga County Juvenile Court simply "rubber-stamped" McGovern's recommendation that Chamaria be reunited with Brock. Although that is a debatable assumption, the Court need not address that question because, even if the act of reunification is chargeable to Defendants, Plaintiff's claim still fails.

11

case at bar.  *See Tazioly v. City of Philadelphia*, 1998 WL 633747 (E.D. Pa. 1998); *Ford v. Johnson*, 899 F.Supp. 227 (W.D. Pa. 1995); *Currier v. Doran*, 23 F.Supp.2d 1277 (D. N.M. 1998), *rev'd on other grounds by* 242 F.3d 905 (10th Cir. 2001).

In *Tazioly*, the most factually similar case Plaintiff cites, the City of Philadelphia's Department of Human Resources obtained legal custody of an infant after the infant was born premature and addicted to cocaine, and after the infant's biological mother appeared hostile, abusive, paranoid, and intoxicated when she visited her infant son in the hospital.  *Tazioly*, 1998 WL 633747 at *3-4.  The boy did not live with his mother before the Department obtained custody; he spent three months in the hospital due to medical complications and, when released from the hospital, was placed in the foster care of his godmother.  *Id.*  Over the next two years, the biological mother displayed "hostile and bizarre" behavior at court proceedings, failed to comply with drug-treatment and other orders, and actually endangered her son during a visit when she held him out of a second-story window, threatening to drop him.  *Id.*  After two years of foster care, custody of the boy was transferred back to his mother, who had a live-in companion.  *Id.* at *5.  Following the transfer of custody, the boy suffered a series of traumatic injuries and abuse that the Department was made aware of, including a fractured leg that put him in a below-the-waist body cast and reports from neighbors that the mother's live-in companion was tearing off the body cast with pliers while the boy screamed in agony.  *Id.*  Over a year after the transfer of custody, concerned neighbors called the police, who came to the mother's house and found the boy in the corner of the dark basement, naked, tied to a chair, covered in bruises and cigarette burns, with a refractured leg that was hanging limply from his body.  *Id.* at *6.

In that case, the court held that "a state actor may be held liable under § 1983 in cases where

the state terminates satisfactory foster care and places a child in the custody of a biological mother with <u>known</u> propensities for violent and bizarre behavior, thereby increasing foreseeable risk of harm to the child." *Id.* at *7 (emphasis in original).  The court distinguished that case from *DeShaney* on the grounds that the boy in *DeShaney* was only in <u>temporary</u> custody for three days, as opposed to two years, and the transfer of custody in *Tazioly* was made with <u>actual knowledge</u> that the mother was unfit and dangerous.  *Id.* at 12.  The *Tazioly* court did not elaborate on why it deemed those distinctions to be significant given the facts and holding in *DeShaney* described above.

Similarly, in *Currier*, the New Mexico court found *DeShaney* distinguishable in a case where the state transferred custody from a neglectful biological mother to an abusive biological father. *Currier*, 23 F.Supp.2d at 1281.  There, the court distinguished *DeShaney* on the ground that the state in *DeShaney* did not disturb the status quo, finding the situation different where the state takes the child from one custody situation (the neglectful mother) and places him in another (the abusive father).  *Id.*

Although the cases cited by Plaintiff are compelling, both emotionally and, to a certain extent, legally, this Court is bound by different precedent that embraces a stricter interpretation of *DeShaney*.  The Sixth Circuit has made clear that the state-created danger doctrine is a "demanding standard for constitutional liability," *Jones*, 438 F.3d at 691, and has construed this exception very narrowly.  Perhaps the greatest difference between Sixth Circuit case law and the Pennsylvania and New Mexico decisions cited by Plaintiff are the Courts' different interpretations of the first element

13

of this claim - that an affirmative act of the state created or increased a risk of harm.[6]

The Sixth Circuit's most recent consideration of the state-created danger doctrine demonstrates this point. In *Jones*, decided February 27, 2006, the Court explained:

> As *DeShaney* and *Bukowski*[7] both show, the time frame for assessing whether an affirmative act has occurred is not <u>after</u> the officers have arrived and temporarily taken control of the situation but <u>before</u> the officers have arrived. In both decisions, the officers took custody of the vulnerable victims and removed the risk of harm to them and only later returned them to the same risk they had faced before their arrival. Were it true that the question whether the officers increased the risk of harm to the victim must be answered from a different vantage point -- namely, <u>after</u> the officers have arrived on the scene and temporarily removed the risk of harm, *see* Dissent Op. at 702-03 -- *DeShaney* and *Bukowski* would have come out differently. Both decisions involved fact patterns in which the officers plainly increased the risk of harm to the victims -- if, that is, the proper vantage point is after, not before, the officers arrived. Instead, however, both decisions rejected these claims, concluding that "the government was merely returning a person to a situation with a preexisting danger." (citing *Bukowski*, 326 F.3d at 709).

*Jones*, 438 F.3d at 696 (emphasis in original). That interpretation has clear basis in *DeShaney* itself, where the Supreme Court noted that the state "placed [the child] in no worse position than that in which he would have been placed had it not acted at all." *DeShaney*, at 201. Viewed from that perspective, the state-created danger doctrine is, appropriately, a narrow doctrine.

Indeed, when the Sixth Circuit has analyzed this element (rather than assumed it), it has found it to be satisfied only <u>once</u>. *See McQueen v. Beecher Community Schools*, 433 F.3d 460 (6th

---

[6] The Third Circuit, the circuit in which the *Tazioly* court sits, has articulated somewhat different elements for the state-created danger doctrine. Those are that: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur. *See Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996). The fourth element of the Third Circuit's factors correlates to the first element of the Sixth Circuit's.

[7] *Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003) will be discussed below.

14

Cir. 2006) ("Although we have assumed the affirmative-act-plus-risk-creation requirement to be satisfied, *Kallstrom* remains the only time we have explicitly held it to be met.").  In *Kallstrom*, the only case in which the Sixth Circuit has found the first element to have been satisfied, a city released private information from the personnel files of undercover police officers to defense counsel representing violent gang members whom the officers had investigated.  *Kallstrom*, 136 F.3d at 1067.  In a brief discussion, the Court held that "[t]he City knew or clearly should have known that releasing officers' addresses, phone numbers, and driver's licenses and the offices' families' names, addresses, and phone numbers . . . substantially increased the officers' and their families' vulnerability to private acts of vengeance." *Id.*

Kallstrom*, of course, is consistent with *DeShaney* and *Jones*.  The city's act of releasing the personnel files in *Kallstrom* created a danger to the officers that would not have otherwise existed, but for the act of the city.  Two other Sixth Circuit cases elaborate on this principle.

In *Jones*, the plaintiff - the estate of a deceased individual - brought an action against police officers and a city, alleging a constitutional violation for the officers' failure to prevent, and active encouragement of, a drag race on the outskirts of Detroit.  *Jones*, 438 F.3d at 688.  The plaintiff presented evidence that the arrival of the officers would have caused the race to be abandoned, but the officers themselves encouraged the race to go forward.  *Id.* at 688-689.  Specifically, the plaintiff presented evidence that the officers told spectators that they were not going to stop the race or arrest anyone, played music from their police vehicles as entertainment, and even placed a bet on the race. *Id.*  The drag race resulted in the death of a spectator, whose estate brought suit against the officers and the city.  *Id.*  The Sixth Circuit rejected the plaintiff's state-created danger argument, finding that the officers did not place the deceased individual in any greater danger than if they had not arrived

at the scene.  *Id.* at 692-93.  The Court explained that "[i]n some circumstances . . . an officer's encouragement of private illegal acts may state a constitutional claim . . . because in some circumstances private misconduct will become public misconduct when it occurs at the prompting of public officials."  *Id.* at 695.  The Court provided a hypothetical example using the facts of *DeShaney*, stating that "if an officer (inexplicably) had encouraged the father in *DeShaney* to beat his son, [the] officer[] plainly would have increased the danger to the victim[]."  *Id.*

In another Sixth Circuit decision, *Bukowski*, the Court rejected a claim under the state-created danger doctrine where the police took temporary custody of a mentally disabled young woman and returned her to the dangerous situation from which they removed her.  *Bukowski*, 326 F.3d at 708-09. In that case, the young woman had been lured far from her home to the home of a man twenty years older whom she met online.  *Id.* at 705.  When she arrived, the man repeatedly raped her.  *Id.*  The parents of the woman, who did not know that their daughter had left home, determined her location after searching her computer and contacted the local police, who picked the woman up and brought her back to the police station.  *Id.* at 705-06.  The officers who spoke with the woman recognized that she was "slow," but ultimately returned her to the man's house after she said he was her boyfriend and after she requested to be returned.  *Id.* at 706.  It was later determined that the woman had been repeatedly raped both before and after being picked up by the police.  *Id.* at 706.  In finding that the police could not be held liable for a constitutional violation for their act of returning the woman back to the house, the Court reasoned that,

> Examining the quality of the governmental involvement here, it is apparent that the government was no more involved in making Bukowski more vulnerable to private violence that it was in *DeShaney* - in both cases, the government was merely returning a person to a situation with a preexisting danger. The plaintiffs' argument that the officials encouraged [the rapist] by their act of returning Bukowski is really

16

the same as the argument that the officials encouraged [the rapist] by their refusal to get involved.

*Id.* at 709 (emphasis added).

In applying *DeShaney*, *Jones*, and *Bukowski* to the present case, this Court must conclude that Defendants cannot be held liable for a constitutional violation under § 1983.  Like the child in *DeShaney* and the young woman in *Bukowski*, Chamaria Drake was merely returned to a situation with a preexisting danger.  In other words, Chamaria was in no greater danger than she would have been had Defendants not acted at all - i.e., if Defendants had never taken custody of her and removed her from Brock in the first instance.[8] "[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter."  *DeShaney*, 489 U.S. at 201.

Further, even if McGovern had pressured Brock into taking custody of Chamaria, which

---

[8] The only difference between the circumstances from which Chamaria was removed and those to which she was returned was Brock's living situation.  Chamaria was removed from Brock while Brock was living in Euclid House, a group home, and Chamaria was returned to Brock while Brock was living with a foster mother.  Plaintiff has not presented any evidence or made any arguments, however, that the danger to Chamaria was greater because of Brock's new living situation.  Although Plaintiff does indicate that Brock's foster mother was a single mother who worked full time, attended school at night, and had four minor children of her own, Plaintiff does not present evidence that the level of supervision Brock received at the group home was greater or smaller than with the foster mother.  There is, moreover, no evidence that Brock's foster mother was neglectful or inadequate as a temporary caregiver and certainly no evidence that Defendants were aware of any failures or inadequacies on her part.  Indeed, her active participation in Brock's SARs evidences Ms. Williams' concerns with the obligations imposed by her oversight role.  Finally, there is no indication that, had the state not removed Chamaria from Brock's custody, that Brock would not have relocated to a foster home with Chamaria at some point.  Brock herself testified that Euclid House is a thirty-day program for teenage mothers, and that, while some stay longer, it is a temporary living circumstance. (Brock Dep. 25:17-22.)  Further, Brock's situation was different also in the sense that she was older and had undergone some treatment, factors which, presumably, would serve to reduce the risk of harm.  The Court, therefore, cannot conclude, absent any evidence or even an argument to that effect, that there was greater danger to Chamaria after reunification based on the change in Brock's living situation.

17

Brock claims, that is not the type of encouragement that imposes liability under § 1983.  While the Sixth Circuit theorized that "if an officer (inexplicably) had encouraged the assailant in *Bukowski* to rape the victim or if an officer (inexplicably) had encouraged the father in *DeShaney* to beat his son, both officers plainly would have increased the danger to the victims," *Jones*, 438 F.3d at 696 (parentheticals in original), that is <u>direct</u> encouragement to commit harm, not the mere encouragement to remain in another's presence.  The decision in *Jones* points out the importance of this distinction.  In that case, there was evidence that the officers actively encouraged the drag race to occur, but the Court nonetheless held that even that was not enough of an affirmative act to create or increase the risk of harm.  In the present case, therefore, McGovern's pressure or encouragement of Brock to retake custody of Chamaria, if proven, would not establish a basis for liability; it appears, pursuant to Sixth Circuit precedent, that only direct encouragement of Brock to harm Chamaria would satisfy the affirmative-act-plus-risk-creation element.  There is simply no evidence that occurred in this case.

Finally, the Court, although somewhat hesitantly, concludes that the length of the custody in this case does not distinguish it from *DeShaney*.  Of the cases that bind this Court's decision, *DeShaney* involved temporary custody of the child for three days and *Bukowski* involved temporary custody of the young woman for, although unclear, probably no more than a few hours.  The parties have not cited, and this Court has been unable to find, any cases in this Circuit involving longer periods of custody.  In contrast to those cases, Chamaria was in temporary custody of the County for seventeen months before being returned to Brock.  One of the Pennsylvania cases cited by Plaintiff, *Tazioly*, contained a similar length of custody.  In *Tazioly*, the court found, without explanation, that

18

the two-year custody in that case distinguished it from *DeShaney*.[9]  Given the Sixth Circuit's clarity

on the law, however, this Court cannot reach the same conclusion.  The Sixth Circuit has reiterated

that "[t]he question is not whether the victim was safer <u>during</u> the state action, but whether she was

safer <u>before</u> the state action than she was <u>after</u> it." *Jones*, 438 at 692 (quoting *Cartwright*, 336 F.3d

at 493) (emphasis in original).  In this case, Chamaria was in no more danger after she was returned

to her mother than she was when she was in her mother's custody at birth; if Defendants had not

acted, she would have been in precisely the same amount of danger, if not more.[10]

---

[9] Of the three cases cited by Plaintiff, *Tazioly* is the only one that expressly mentions the length of custody as a distinguishing factor.  The court in *Currier* relied primarily on the changing of the custodial situation from one parent to the other (a changing of the status quo), and *Ford* focused on the distinction between placing a child with a foster parent compared to a biological parent, determining that placement with a biological parent does not, by itself, preclude liability as a matter of law.

[10] There may be some basis in *DeShaney* and *Jones* to find that the length of custody might alter the analysis.  Specifically, the relevant portions of those opinions contain the word "temporary" in reference to the state custody or control.  *See DeShaney*, 489 U.S. at 201 ("That the state once took <u>temporary</u> custody of Joshua does not alter the analysis.");  *Jones*, 438 F.3d at 696 ("[t]he time for assessing whether an affirmative act has occurred is not after he officers have arrived and <u>temporarily</u> taken control of the situation but before the officers arrive" and ". . . after the officers have arrived on the scene and <u>temporarily</u> removed the risk of harm . . .") (emphasis added to both).  Aside from the use of the word "temporary," however, there is no basis for making a distinction based on the duration of the state action, especially because duration was not a consideration in either of those cases.  In addition, the state's custody of Chamaria in this case was characterized as "temporary custody" by the juvenile court.  Given that the "state-created danger" doctrine was only inferred from *DeShaney* and not expressly declared (even though the court expressly mentioned the "special relationship" exception), given that it has not yet been tested by the Supreme Court, and given that the Sixth Circuit has only once found the affirmative-act-plus-risk-creation element to have been met, this Court cannot assume an expansion of such a narrowly-applied rule.  Absent any indication what meaning this Court should give to the word "temporary" in the *DeShaney* and *Jones* decisions, and given that Chamaria was also in "temporary" custody, this Court is bound by what it perceives to be clear guidance from both the Supreme Court and the Sixth Circuit.  In addition, it is worth noting that, "even were we to move the doctrine in these directions, that would not advance this claim because the very act of modifying these rules would defeat plaintiff's obligation to show that the [Defendants] violated 'clearly established' law." *Jones*, 438 F.3d at 699.

### 3.      Special Relationship Exception

Plaintiff also attempts to invoke a second exception to the general principle that the Due Process Clause does not impose an affirmative duty on the state to protect an individual from private acts of violence.  That exception was explained by the Supreme Court in *DeShaney* and since has been labeled the "special relationship" exception.  In *DeShaney*, the Court explained that "[i]t is true in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals."  *DeShaney*, 489 U.S. at 198.  The Court went on to explain that these circumstances were present in situations of incarcerated prisoners, *Estelle v. Gamble*, 429 U.S. 97 (1976), involuntarily institutionalized mental patients, *Youngberg v. Romeo*, 457 U.S. 307 (1982), and other individuals subjected to similar restraints on liberties by the state. *DeShaney*, 489 U.S. at 198-200.  The rationale behind this exception, the Court explained, is that "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs - *e.g.*, food, clothing, shelter, medical care, and reasonable safety - it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200.

In *DeShaney* itself, the Court rejected the plaintiff's argument that the state took on a "special relationship" with the child by virtue of its knowledge that the child was in danger and the state's attempt to protect him.  *Id.* at 197.  The Court held that the special relationship exception could not apply in that case because the child was in his father's custody, not the state's custody, when he was injured. *Id.* at 201.

In the present case, Plaintiff argues that a special relationship existed between Chamaria and

the County in this case, thus imposing an affirmative duty on the County to protect Chamaria.  In support of that assertion, Plaintiff points out that the County provided family counseling services to Brock for the benefit of Chamaria, that Brock and Chamaria were living in a state-sponsored foster home, and that the County provided financial support to both Brock and Chamaria.  Significantly, Plaintiff does not cite any <u>law</u> to support the proposition that Chamaria's situation constituted state custody or would otherwise impose a constituional duty on the state.  Indeed, Plaintiff's argument directly contradicts both *DeShaney* and Sixth Circuit precedent.

It is undisputed in this case that the Cuyahoga County Juvenile Court's order of January 23, 2003, committed Chamaria to the legal custody of Brock.  At the time Chamaria was injured, therefore, she was in Brock's legal custody, not the County's.  This situation does not present the "certain limited circumstance" contemplated by the Court in *DeShaney*.  In *Bukowski*, moreover, the Court rejected a similar argument, noting that the <u>lack</u> of custody is precisely what the plaintiffs were complaining about.  *Bukowski*, 326 F.3d at 709, n. 1.  Likewise, in the present case, Plaintiff complains that Defendants should have retained custody of Chamaria to protect her; they cannot also claim that, having transferred custody, the County nonetheless had a special custodial relationship with Chamaria that imposes a constitutional duty.  For those reasons, Plaintiff's argument as to this exception must fail.

## III.    CONCLUSION

Having concluded that neither the state-created danger theory nor the special relationship exception apply to this case, the Court finds that Plaintiff cannot maintain a claim under § 1983 for

21

deprivation of Chamaria's Fourteenth Amendment right to due process.[11]  Summary judgment in favor of the County Defendants, the only moving defendants and only defendants against whom such a claim is asserted, is **GRANTED** as to Plaintiff's § 1983 claim.  That claim is, therefore, **DISMISSED**.

In reaching this conclusion, this Court echoes sentiments expressed by the Supreme Court in *DeShaney* and the Sixth Circuit in *Jones*, that it is tempting to find that factual scenarios such as these impose liability on state actors.  "But the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation.  A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes.  But not 'all common-law duties owed by government actors were . . . constitutionalized by the Fourteenth Amendment.'" *DeShaney*, 489 U.S. at 202 (quoting *Daniels v. Williams*, 474 U.S. 327, 335 (1986)) (other citations omitted).  Indeed, in this matter, the remaining state law claims may impose such liability, but that is a matter that the state legislature and courts are in the best position to decide.

Accordingly, as Plaintiff's § 1983 claim is the only claim in this matter over which this Court had original jurisdiction, the Court exercises its discretion, pursuant to 28 U.S.C. § 1367(c)(3), to decline to retain supplemental jurisdiction over the remaining state law claims against all defendants in this case, as well as the cross-claim asserted by the County Defendants against Brock.  The Court,

---

[11]  Because the Court concludes that there is no constitutional violation in this case, it does not address whether the County is subject to liability based on an official policy or custom that caused a constitutional violation, or whether McGovern is entitled to absolute or qualified immunity.

therefore, **REMANDS** this matter to the Cuyahoga County Court of Common Pleas, where it was originally filed.  This case is **DISMISSED**.

      **IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 28, 2006**